**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 24 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ROBERT D. LAMPKIN,

      Plaintiff-Appellee,

v.

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA (UAW);
LOCAL NO. 1093 OF THE
INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA (UAW),

      Defendants-Appellants,

and

MCDONNELL DOUGLAS-TULSA, a
division of McDonnell Douglas
Corporation,

      Defendant.

No. 96-5212

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 93-CV-200-E)**

Steven R. Hickman of Frasier, Frasier & Hickman, Tulsa, Oklahoma, for Defendants-Appellants.

Jon B. Comstock, Bentonville, Arkansas, for Plaintiff-Appellee.

---

Before **BALDOCK** and **HOLLOWAY,** Circuit Judges, and **BROWN,**[*] Senior District Judge.

---

**HOLLOWAY,** Circuit Judge.

---

The McDonnell Douglas Corporation (the employer or the company) terminated the employment of plaintiff-appellee Robert Lampkin because of his absenteeism. Lampkin brought suit in District Court of Tulsa County, Oklahoma, against McDonnell Douglas for wrongful termination in February 1993. With his claim against McDonnell Douglas, plaintiff joined claims against his unions, the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America and Local 1093 of the UAW, its local affiliate (collectively referred to hereinafter as the unions), for breach of the duty of fair representation in his behalf. Thus this was a "hybrid" action under section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185.

The defendants removed the case to the United States District Court for the Northern District of Oklahoma in March 1993. I Aplt. App. at 175. While the notice of removal is not in the appendix, the Agreed Pretrial Order states that plaintiff asserts three claims: (1) for his

---

[*]The Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation.

allegedly unlawful discharge by McDonnell Douglas in violation of his rights under the collective bargaining agreement; (2) for breach by defendant UAW and Local 1093 of their duty of fair representation owed to plaintiff Lampkin; and (3) for allegedly tortious interference with economic expectation for plaintiff relating to unemployment compensation. The first and third claims are not at issue in this appeal. The jurisdiction of the district court is said to be conferred by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. As to claims (1) and (2), the case is one of which the district courts of the United States have original jurisdiction and was therefore removable to the district court. 28 U.S.C. § 1441.

After a jury trial, McDonnell Douglas was found liable for wrongful termination in breach of the collective bargaining agreement and for damages of $16,500 to plaintiff Lampkin. McDonnell Douglas commenced an appeal from the judgment against it, but dismissed its appeal after reaching a settlement with Lampkin.

On the verdict form, the jury also found that the unions had breached their duty of fair representation of Lampkin but awarded no damages against the unions. I Aplt. App. at 114-15. In addition to the verdict form, the jurors had been given a special interrogatory to be completed only in the event that they determined that the unions had breached their duty of fair representation. On this form, the jurors were asked whether "the attorney fees chargeable to the efforts required of plaintiff to enforce the collective bargaining agreement against the employer[] should be awarded as an element of damage to the plaintiff?" This interrogatory then informed the jurors that if they answered that question in the affirmative,

which the jurors did, then the court would "conduct a hearing after the jury has been dismissed at which time the court will hear evidence and determine the amount of any fee to be awarded." I Aplt. App. at 116.

The district judge ultimately awarded attorneys' fees in the amount of $13,027.48 against the unions as compensatory damages due from the unions for breach of their duty of fair representation of Lampkin. The unions then commenced this appeal after the district court had denied a second motion under Fed. R. Civ. P. 50(b).[1] We have jurisdiction of this appeal pursuant to 28 U.S.C. § 1291.

**I**

We, *sua sponte*, noted a possible problem regarding the scope of our jurisdiction and ordered the parties to submit memoranda on this issue: Whether this court has jurisdiction to review the judgment on the merits where the notice of appeal was filed more than 30 days after entry of the order of March 22, 1996, denying the appellant unions' Rule 50 motion? We conclude that we have jurisdiction over all issues raised by the unions.

The jury verdict was returned on April 6, 1994, but, as noted, the jury put zeroes in the blanks asking for the amount of damages against the two unions. The court did not immediately enter judgment on the jury verdict, but invited the parties to submit proposed

---

[1] We note that in the district court the local affiliate union argued that it was not the bargaining representative of the employees. Because no such argument is raised on appeal, we may properly treat all issues as affecting the international union and the local affiliate identically. *See Considine v. Newspaper Agency Corp.*, 43 F.3d 1349, 1357 n.8 (10th Cir. 1994).

judgment forms and motions as to the issue of attorneys' fees that might be awarded against the unions. All three defendants filed post-trial motions for judgment as a matter of law under Fed. R. Civ. P. 50(b) within ten days of the jury verdict. Also within ten days of the verdict, plaintiff Lampkin filed an "Application For Post-Verdict Determination of Attorney Fees and Entry of Judgment On Jury Verdict." Judgment was entered against McDonnell Douglas on April 29, 1994, but entry of judgment against the unions did not come until later.

The district court held a hearing on the motions of Lampkin and the unions on November 7, 1995, at which the judge denied the unions' Rule 50(b) motion and took the remaining issues under advisement. IV Aplt. App. at 1034. On March 22, 1996, the district judge entered an order formally denying the unions' motion for judgment as a matter of law and setting a hearing to determine the number of attorney hours for which plaintiff should be compensated. Testimony and argument were heard on April 10, 1996, and the judge fixed Lampkin's recovery at $13,027.48. Judgment in that amount was entered on May 14, 1996. I Aplt. App. at 127-28. On May 28, 1996, the unions filed a second Rule 50(b) motion, which alternatively asked for a new trial. The district court denied that motion in an order entered on September 3, 1996, and the unions filed their notice of appeal on September 12.

Lampkin urges that the district court's order of March 22, 1996, which denied the unions' post-trial motion for judgment as a matter of law, was an appealable final order "on the merits." Accordingly, Lampkin contends that the unions' appeal is timely only as to the amount of fees awarded. At argument, counsel for Lampkin stated that the case most closely

on point is *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196 (1988). We disagree. The holding in that case was that, even in diversity cases, the question whether the district court's decision on the merits is appealable before the attorneys' fees determination has been made is one of federal law under which the determination of attorneys' fees is ordinarily a collateral matter which does not suspend finality of the judgment on the merits. *Id.* at 200, 202. *See White v. New Hampshire Dept. of Employment Security*, 455 U.S. 445 (1982).

In *Budinich*, the Court rejected an argument that "the general status of attorney's fees for [28 U.S.C.] § 1291 purposes must be altered when the statutory or decisional law authorizing them makes plain . . . that they are to be part of the merits judgment." 486 U.S. at 201. A close reading of the Court's opinion reveals, however, that the holding there does not apply to cases such as this one, which does not involve an award for the prosecution of the case against *the unions*, but instead makes the unions responsible, as a part of compensatory damages, for the attorneys' fees incurred in pressing plaintiff's claim against *the employer*.

*Budinich* held that "the § 1291 effect of an unresolved issue of attorney's fees *for the litigation at hand* should not turn upon the characterization of those fees by the statute or decisional law that authorizes them." *Id*. at 201 (emphasis added). This limitation of the Court's holding to attorneys' fees requests for the "litigation at hand" is crucial to our resolution of the jurisdictional issue here. The Court justified its holding in large part by the substantial need for a uniform rule providing "operational consistency and predictability in

the overall application of § 1291." *Id*. at 202. The Court repeated the limitation of its holding, on which we rely in this case, when it said that the goal of consistency and certainty of application under § 1291 "requires, we think, a uniform rule that an unresolved issue of attorney's fees *for the litigation in question* does not prevent judgment on the merits from being final." *Id*. (emphasis added). Nor are these the only expressions in the case which we take as instructive here. Repeating the holding that we have just quoted and its underlying policy considerations, the Court said: "Courts and litigants are best served by the bright-line rule, which accords with traditional understanding, that a decision on the merits is a 'final decision' for purposes of § 1291 whether or not there remains for adjudication a request for attorney's fees *attributable to the case* ." *Id*. at 202-03 (emphasis added). In spite of the Court's recognition of the need for a bright-line rule, the holding is not universally applicable. We think the Court's careful limitation of the type of attorneys' fees recoveries subject to its holding was a recognition that there are cases which must be analyzed differently. And we are convinced that this is such a case.

Under the circumstances of this case the award of attorneys' fees is an award of compensatory damages for breach of the duty of fair representation under the LMRA, which only incidentally happens to be measured in this instance solely by the attorneys' fees incurred by the plaintiff Lampkin. It has long been recognized that in these hybrid actions by an employee against the employer and the union,

> [t]he governing principle . . . is to apportion liability between the employer and
> the union according to the damage caused by the fault of each. Thus, damages

-7-

attributable solely to the employer's breach of contract should not be charged to the union, but increases if any in those damages caused by the union's refusal to process the grievance should not be charged to the employer.

*Vaca v. Sipes*, 386 U.S. 171, 197-98 (1967). In applying this governing principle, a number of cases have reasoned that an employee's damages are increased when he is forced to incur attorneys' fees in order to achieve the result that the union, as his bargaining representative, should have obtained for him, and that this increase in damages, consisting of fees incurred in pursuing the claim against the employer, is properly recoverable against the union. The theory has been concisely explained by the Third Circuit:

> When there is a legal duty to provide representation, whether that duty arises out of a contractual undertaking or, as here, by operation of law, if the representation is wrongfully withheld, the cost of substitute representation should be recoverable damages. This is not to say that in the suit against the Union fee shifting as such would be appropriate. Rather, the employee should recover as damages from the Union only the attorneys' fees incurred in pursuing the section 301 claim against the employer – consequential damages flowing from the Union's alleged breach of its duty of fair representation.

*Ames v. Westinghouse Electric Corp.*, 864 F.2d 289, 293 (3d Cir. 1988). We have not found a case from our own circuit in which we have applied this principle, but we have noted its application in *Ames. Aguinaga v. United Food & Commercial Workers Internat'l Union*, 993 F.2d 1480, 1483 n.2 (10th Cir. 1993).

In sum, we hold under the circumstances of this case the award of attorneys' fees recovered by the plaintiff represents *compensatory damages* and is inseparable from the "merits" of plaintiff's claim against the unions. As an integral part of the merits those damages — the attorneys' fees — were not settled until denial on September 3, 1996, of the

-8-

unions' second Rule 50(b) motion, following which a timely notice of appeal was filed on September 12, 1996. Accordingly we find no jurisdictional defect and will proceed to consider all of the issues raised by the unions. As further support for our jurisdictional holding, we note that no judgment on a separate document in compliance with Fed. R. Civ. P. 58 was entered against the unions until May 14, 1996, and the time for appeal from the judgment was extended by the unions' filing on May 28, 1996, of a motion for judgment as a matter of law under Fed. R. Civ. P. 50(b).

## II

### A

On the merits, the unions first argue that the judgment against them should be reversed because Lampkin failed to produce sufficient evidence to maintain his claim against the company for wrongful termination in breach of the collective bargaining agreement. Lampkin stipulated below and acknowledges on appeal that success on his claim against the company is a prerequisite to his claim against the unions. The theory of liability against the unions is that they breached their duty to bargain in good faith on behalf of Lampkin and that he suffered legal injury as a result. If Lampkin's claim against the company had failed, then *ipso facto* he could not prove that he suffered legal injury because of the alleged dereliction of duty by the unions; instead, in that event, the conclusion necessarily would be that no amount of effort by the unions on Lampkin's behalf would have produced a favorable outcome for him. *See DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151,

164-65 (1983) (claims against union and against employer are "inextricably interdependent");
*Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570-71 (1976) ("To prevail against either the company or the Union, [the employees] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union.").

The collective bargaining agreement as applicable to Lampkin would allow for his "discharge for cause." Agreed Pretrial Order, I Aplt. App. 23. At trial the company attempted to prove the discharge was based on Lampkin's violation of the company's attendance policy.[2] Lampkin did not dispute that violation of the attendance policy could be sufficient cause for discharge, but contended that he had not violated the policy because his last absences were, or should have been, excused. We agree with Lampkin's position that the record supports the jury's verdict.

Lampkin's case was based primarily on his own testimony. Much of his testimony was challenged by evidence presented by the employer or the unions. However, on appeal we view the evidence in the light most favorable to the jury's verdict and defer to its determinations on all issues of credibility of the witnesses, the inferences it may draw from the facts established, its resolution of conflicts in the evidence, and its ultimate conclusions of fact. *E.g., Oklahoma Federated Gold & Numismatics, Inc. v. Blodgett*, 24 F.3d 136, 142

---

[2]The company made some attempt at trial to justify the discharge on the basis that Lampkin had been an unsatisfactory performer when he was on the job. This contention is not made on appeal.

(10th Cir. 1994).

Lampkin started working at McDonnell Douglas's Tulsa manufacturing facility in 1988 as a router operator. In 1992 he became an "aerostructure mechanic B" involved in making parts for jet aircraft. The controversy here mainly concerns Lampkin's attendance record. Under the company policy, employees are not given sick leave like most workers. Instead, employees may receive a bonus at the end of the year if their absences have been few. The company's attendance policy is expressed in terms of guidelines. Absences from work for all or part of a day are "deviations" subject to limits set by the Attendance Guidelines. Defendant's Exhibit 2, I Aplt. App. at 144-46. Any of the following occurring within a thirty day period would be outside the guidelines: (1) being absent for more than one day; (2) being tardy more than three times or leaving early more than three times; (3) any combination of tardies and "early outs" greater than three; or (4) one absence plus one tardy or early out. *Id.* at 145-46. An absence, tardy, or early out could be excused by the worker's supervisor, and under normal circumstances it would not be held against an employee for discipline unless an unsatisfactory pattern of excessive attendance deviations occurred. III Aplt. App. at 635-36.

In June 1991 Lampkin received a record of "unsatisfactory performance," and in July he was given a written reprimand. That reprimand was later rescinded, however, when Lampkin produced documentation that one of his absences had been for a court appearance. Lampkin's supervisor excused that absence, which resulted in no violation of the attendance

guidelines. Two months after that, Lampkin was again given a written reprimand for excessive deviations from the attendance guidelines. Two months later in November 1991, Lampkin was put on final "warning" for attendance deviations.[3]

In late 1991 Lampkin was suspended from his employment pending investigation of reports that he had threatened to kill his supervisor. Lampkin denied having made any threats and he was reinstated on January 6, 1992. There was a dispute as to whether Lampkin remained subject to the final warning on attendance which was issued in November 1991. Lampkin testified he was told that he was coming back and his "slate would be wiped clean . . . ." II Aplt. App. at 329. Werner testified that she told Lampkin that he still remained on final warning for attendance so that any deviation in excess of the guidelines would result in termination of his employment. III Aplt. App. at 650-52.

At a meeting in early 1992, Lampkin said that he was planning to marry and asked if he could be granted some time off in April. III R. at 655. Although Werner declined to promise him that the request would be granted, she later decided, in consultation with his supervisor, that his attitude and attendance were improved to the point that he should be given the requested time off. The wedding was to occur on the evening of Friday, March 27, 1992, and Lampkin had not asked for that day off, only the following week. In fact, he left

_____

[3]We note that at trial the employer maintained that, in accordance with its established practice, the final warning meant that if Lampkin exceeded the absences permitted by the attendance guidelines again, that he *would* be terminated. However, Lampkin pointed out that the actual written final warning informed him that in the event of another excessive absence he *could* be terminated.

-12-

work on March 27 only a couple of hours after his shift had begun. Thus, unless excused, this "early out" was an attendance deviation but not alone a violation of the guidelines. Lampkin, however, testified that he believed that he was excused to leave early because his supervisor Magee had actually approved it. II Aplt. App. at 337.

Misfortune struck after Lampkin's honeymoon. On April 7, 1992, which would have been his second day back from his leave, Lampkin was on the way to work when he was involved in a traffic accident at about 5:45 a.m. II Aplt. App. at 343. Lampkin's wife, who was a passenger in the car, was seriously injured and both were transported to St. Francis Hospital in Tulsa. Mrs. Lampkin had a serious back injury and initially there was concern that she might be paralyzed or that her injuries could even be life threatening. Lampkin himself was treated in the emergency room for several hours, and then spent the rest of the day and the night in his wife's room.

Lampkin said he made a number of contacts with the company after the accident. Lampkin testified that he left a message explaining where he was and why he would not be at work. II Aplt. App. at 350-51.

Soon after Lampkin arrived back at work on April 9, 1992, he was called into a meeting with Werner and his supervisor, Rob Magee. Other company representatives and other union representatives were also present. Lampkin testified that he was told that he was being terminated for being absent on the last two days and for not having called in to notify his supervisor of his absence. Lampkin said that he told Werner and the others about the

-13-

calls he had made over the last two days to Vincent, to absence control, and to others.

The trial judge instructed the jury that Lampkin's "First Claim is that he was discharged by McDonnell Douglas without just cause in violation of the collective bargaining agreement." I Aplt. App. at 100. The agreement would allow his "discharge for cause." Agreed Pretrial Order, I Aplt. App. at 23. The company contended that just cause existed because of plaintiff's violation of the attendance guidelines while he was on final warning for attendance deficiencies. Lampkin's position was that his absences had been excused and that he thus had not violated the guidelines. Lampkin also contended that he had not been on final warning because when he was reinstated on January 6, 1992, he returned with a clean slate.

Viewing the evidence in the light most favorable to the jury's verdict, as we must, we conclude that the evidence was sufficient to support the verdict against the company. The jury could have found that Lampkin was no longer on final warning for attendance so that even if his absences on the day of the car accident and the following day were not excused, they still should have resulted in disciplinary action short of termination, consistent with the company's practice of progressive discipline.

The jury was instructed, without objection insofar as we can discern, as follows concerning just cause for discharge:

> You are instructed as a matter of law that an employer may only discharge an employee governed by a collective bargaining agreement, such as the one involved in this case, if 'just cause' exists for his dismissal. The term 'just cause' means a real cause or basis for dismissal, such as may be contained in

-14-

a company's policies, procedures, and contracts, as distinguished from an arbitrary whim or caprice; that is *some cause or ground that a reasonable employer, acting in good faith in similar circumstances, would regard as good and sufficient basis for terminating the services of an employee*.

I Aplt. App. 102 (emphasis added).

We conclude that from all the evidence, the jury could reasonably find that the company's actions were neither reasonable nor in good faith. The company's position was weakened by some of the testimony given by its own representatives. Werner testified that if Lampkin had just come in to work for 10 or 15 minutes on April 7 and April 8, then he would not have been out of the guidelines. III Aplt. App. at 660-61. The jury could have inferred from all the evidence that the company was not applying its policies reasonably and in good faith when Lampkin was discharged.

In sum, we hold that the evidence, viewed in the light most favorable to the jury verdict, was sufficient to support the verdict in favor of Lampkin and against McDonnell Douglas on his wrongful discharge claim. I Aplt. App. at 114.

**B**

The unions also argue that the evidence was insufficient to support the jury's verdict in favor of plaintiff Lampkin on his claim of breach by the unions of their duty of fair representation. I Aplt. App. at 114-15. The standard to support a judgment against a union for breach of its duty of fair representation is high: A breach of the duty of fair representation occurs "only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. at 190.

-15-

Any substantive examination of a union's performance "must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 78 (1991). The plaintiff must show that the unions' actions were so far from reasonable as to be wholly irrational or arbitrary. *Id.*

Here the unions do not assert that the district court erred in setting out the governing law in the jury instructions. They argue only that the evidence was insufficient to support the verdict on this claim. On review of that evidence, we of course resolve all conflicts in favor of the verdict and likewise must draw all reasonable inferences in favor of the prevailing party. *Oklahoma Federated Gold & Numismatics, Inc. v. Blodgett*, 24 F.3d at 142. As was the case with the previous issue, the unions' argument does not squarely address the fact that the jury heard substantial evidence favoring Lampkin which conflicted with that adduced by the defendants.

Lampkin initiated a grievance procedure with his union representative. According to Lampkin's testimony, he told Scott Sewell, one of the union representatives, about all of his efforts to contact the company from the hospital on April 7 and April 8, 1992. Lampkin testified that Sewell told him more than once that it was wrong for the company to have fired him for having been in a car wreck and that the unions would get his job back. II Aplt. App. at 387-89. Lampkin said that he was told that the grievance might have to go through pre-arbitration or all the way to arbitration. Sewell never made any statement to Lampkin

-16-

that the case was not "a winner" or that it was an "iffy" proposition and that an arbitrator might rule against Lampkin. *Id*. at 389.

The grievance procedure set up by the collective bargaining agreement can go through as many as four steps. In most termination cases the first step, a very informal meeting with the employee's direct supervisor, was skipped. In Lampkin's case, however, there was a preliminary meeting. Mr. Magee, Lampkin's supervisor, testified that union representatives and Lampkin were there. IV Aplt. App. at 799. The pitch of the union to the company on the case was simply that the grievance was read, as it always is, and that was about all of the discussion about the grievance that Magee could recall other than simply "basically begging to get [Lampkin's] job back." *Id.* Magee said Lampkin did not argue that he had not exceeded the attendance guideline. *Id.* at 800.

When this first step meeting was unsuccessful, the second step was reached. This was a meeting, which Sewell referred to as a hearing, between several company representatives and several union representatives. When that meeting failed to convince the company to reinstate Lampkin, the process moved on to the third step, pre-arbitration.

The jury heard almost nothing about what goes on generally in pre-arbitration hearings or what was presented in this case specifically. There was evidence that the unions kept the Lampkin grievance on the pre-arbitration list for some months, but there was little explanation of what that meant, except a vague statement that all grievances on the pre-arbitration list were discussed at a "pre-arb meeting" once each month. Nothing was said

about the content of any discussions of Lampkin's grievance in these meetings. Finally, the unions notified the company by a letter dated September 21, 1992, that the grievance was withdrawn. Lampkin testified that he was not informed of this action until about two months later.

The unions' testimony, as presented by their witness, Mr. Cox, was that from review of Lampkin's folder "we just didn't feel like we could pursue it to arbitration and win it." IV Aplt. App. at 853. Cox added that "you also have got a responsibility to look at the union's finances and think and decide if you can afford all of these things . . . . With the record and past history that I have had in other plants, we just can't win an absenteeism . . . ." *Id.* at 853.

We hold that the evidence was sufficient to support the verdict against the unions for arbitrary handling of the grievance and processing it in a perfunctory fashion. Lampkin's testimony showed that he had told his side of the dispute to several union representatives and had been consistently told that he couldn't be fired for having been in a car wreck and not coming to work. He said Sewell told him "[w]e'll win this grievance and get your job back, don't worry about it." II Aplt. App. at 387. Lampkin said that he initiated most of the contacts with the unions during the months when his grievance was pending, although he was called a few times. The unions never communicated anything to him in writing, he said, and he did not learn until late October or early November 1992 that the unions had withdrawn his grievance on September 21, 1992. Finally, Lampkin called Sewell and was told: "the

union pulled it because it couldn't be won." *Id.* at 395.

A breach of duty may consist of "arbitrarily ignor[ing] a meritorious grievance or process[ing] it in a perfunctory fashion." *Young v. UAW-Labor Employment & Training Corp.*, 95 F.3d 992, 998 (10th Cir. 1996) (quoting *Vaca v. Sipes*, 386 U.S. 171, 191 (1967)). Ms. Werner, the company witness, testified that the unions did not in the grievance meetings convey the position that "the company has got it all wrong. [Lampkin] was within the guidelines . . . ." or that Lampkin called in about his problems at the time of the accident. III Aplt. App. at 675. Instead, she said, the unions' only argument was "asking me to give him another chance. [The unions] claimed he had learned his lesson . . . and that he would straighten up and come to work and be a good employee." *Id.*

Most significantly, the unions do not contend on appeal, nor have we seen any indication in the record, that they ever presented the contentions that the company's own documents did not support its position that Lampkin was on final warning for attendance at the time of his termination; that Lampkin had made all reasonable efforts to notify management that he could not be at work because of the car wreck and his wife's serious condition; that the company's own policies provided that advance notice of absences was not required in emergencies; that the serious nature of Mrs. Lampkin's injuries constituted "essential personal business" which the company's policy promised "will be given special consideration and will not be counted as attendance deviations unless continually repeated"; or that the company was obligated to apply its policies reasonably and in good faith. And the

-19-

jury could have inferred from Cox's testimony, noted above, that the union put its finances ahead of the vigorous presentation of Lampkin's case in carrying out its duty of fair representation.

We note that a near total failure to present the employee's side of the case in the grievance procedure has been held to constitute arbitrary and perfunctory conduct in breach of the duty of fair representation. *Griffin v. Internat'l Union, U.A.W.*, 469 F.2d 181, 183 (4th Cir. 1972) ("A union must especially avoid capricious and arbitrary behavior in the handling of a grievance based on a discharge - the industrial equivalent of capital punishment."). In *Griffin*, the employee had come to blows with his supervisor and been fired. The union insisted on filing the grievance with the same supervisor. The union contended that it basically had no choice: the grievance had to be filed with the supervisor or with the next higher authority, who was the manager who actually terminated the employee, and who presumably would be unlikely to reverse his own decision. In rejecting the notion that this was really no choice at all, the court noted that the manager had heard only the supervisor's version of the events; if the employee's case had been presented to the manager, he might not have chosen such a drastic disciplinary measure. Similarly, in Lampkin's case the company representatives in the pre-arbitration meetings did not hear Lampkin's side of the case developed.

Union conduct in processing a grievance was also held to be in breach of the duty of fair representation in *Service Employees Internat'l Union, Local No. 579*, 229 N.L.R.B. 692,

1977 WL 8661 ** 6 and 7 (1977). There employee Evans was fired for switching shifts without permission, in violation of the collective bargaining agreement. Evans testified that she had permission. There was evidence that a union representative met with a manager and was told that the employer had a lot of problems with Evans, whose history with the employer included some warnings and disciplinary actions. It seems that the union basically surrendered at that point. The ALJ, whose opinion was adopted by the Board, emphasized that the union did not attack the reason given for the discharge and did not press Evans' position that she had cleared her plan ahead of time.

We have considered our recent opinion in *Young v. United Automobile Workers - Labor Employment and Training Corp.*, 95 F.3d 992 (10th Cir. 1996). We there upheld a summary judgment for the union in a fair representation claim case. The case is clearly distinguishable from Lampkin's because in *Young* the union actually took his grievance over his discharge to arbitration; the union presented testimony that Young's work performance was good; they concentrated on that issue over a dishonesty issue because the allegedly dishonest statements were felt by Young himself not to be an issue, as the union representatives in the arbitration proceeding likewise felt. The union representatives also prepared a thorough post-hearing brief for the arbitrator. The case is thus a far cry from the facts in Lampkin's case where there was only an abbreviated presentation made of Lampkin's side of the case in the early stages and then, without advising Lampkin, the union "pulled" his grievance before an arbitration hearing.

-21-

In sum, we must agree that under the standard laid down in *Vaca v. Sipes, Airline Pilots Ass'n v. O'Neill,* and our own *Young* opinion, here the jury could reasonably infer that the unions processed the grievance in a perfunctory fashion and pulled it arbitrarily. Thus, viewing the record as we must favorably to the verdict, we uphold the jury's determination on the fair representation claim.

### III

The unions contend further that the judgment must be reversed because the jury found that Lampkin had suffered no damages as a result of the unions' breach of their duty of fair representation. As we explain in Part IV, *infra*, we hold on this record that the unions had waived their right to have the amount of damages determined by a jury. And as we have already explained in Part I, *supra*, the attorneys' fees awarded to Lampkin in this case represented damages for the unions' breach of duty. This is shown by the fact that the measure of damages was the attorneys' fees necessarily incurred in winning a judgment against *the employer*. By contrast, if plaintiff had been awarded attorneys' fees as a prevailing party, the trial court would have had to determine the amount of fees necessarily incurred in winning the judgment against *the unions*. Therefore, the unions' reliance on *Farrar v. Hobby*, 506 U.S. 103 (1992), is misplaced.

Given these parameters for our inquiry, and the instruction to the jury which we have already described, we conclude that the unions' argument is without merit. Lampkin reasonably relied on the pretrial order's provision that the attorneys' fees would be

determined by the judge, as we discuss in Part IV. In these circumstances, the lack of a determination of damages in the jury's verdict is perfectly logical and, indeed, the only decision the jury could have made on damages since at trial Lampkin had not attempted to quantify the damages he sought against the unions. We presume that the jurors understood the explanation they had been given that the judge would set the amount of attorneys' fees. Thus, in this instance a finding of no damages did not represent a finding that there had been no compensable injury; instead the jury merely recognized that the trial judge would determine the fees for this element of the damages. Therefore we reject the unions' argument.

**IV**

The Seventh Amendment right to a jury trial applies in hybrid suits under section 301 as to an issue such as the damages sought here against the unions. *See Chauffeurs, Teamsters and Helpers Local No. 391 v. Terry*, 494 U.S. 558, 570-73 (1990). The unions contend that their Seventh Amendment right to trial by jury was violated by the court's determination of the amount of damages, which consisted solely of attorneys' fees. We reject this contention because the record reveals that the unions acquiesced in the procedure followed by the district court.[4] Four weeks before trial began, an amendment to the pretrial order was entered

_____

[4]At oral argument, counsel for the unions vigorously argued that there was no stipulation or agreement that the trial judge could determine the attorneys' fee issue, while counsel for appellee Lampkin argued that there was such an agreement. As noted in the text, the record shows no objection to the procedure provided for in the amendment to the pretrial order which was that the damages in the form of reasonable attorneys' fees and litigation

-23-

by the district court which specifically provided that "damages in the form of reasonable attorney fees and litigation costs (only to the extent of fees and costs incurred in the action against [McDonnell Douglas]) should be awarded to the Plaintiff *after a post-verdict determination by the court."* Aple. Supp. App. at 1 (italics added). The unions fail to show, and our review of the record has not revealed, that they made objection to this procedure before the plaintiff had rested his case at trial. A party who stipulates in the pretrial order to submission of an issue to the court has waived the right to a jury determination of the issue. *FMC Corp. v. Aero Industries, Inc.*, 998 F.2d 842, 845 (10th Cir. 1993).

The unions argue that they construed the amendment to the pretrial order as simply saying that it was a legal issue for the district judge to decide whether the procedure described in the amendment should be followed. We are not persuaded. First, the amendment to the pretrial order simply does not say what the unions assert that they understood it to say. Second, the trial judge stated on the record his understanding that the unions had agreed to the procedure of having the fees quantified by the court after trial. IV Aplt. App. at 1041-43. The district judge's interpretation of his own order is, of course, the most authoritative. Third, we note that in the original pretrial order the unions had listed several issues of fact to be tried, which did not include any reference to the amount of damages caused by the unions' alleged breach of the duty of fair representation. I Aplt. App.

---

costs should be awarded to the plaintiff after a post-verdict determination by the court. Aple. Supp. App. at 1-2.

-24-

at 41.

Thus the issue is not whether the unions were entitled to a jury determination of damages under the Seventh Amendment, but whether the trial judge committed error in finding that the unions had waived their right to jury trial on the issue of the amount of damages to be awarded by failure to object in a timely manner to the amendment to the pretrial order. On this record, we see no error in that finding.

**V**

The unions contend that the amount of the judgment against them is excessive. As we noted in Part I, *supra,* the measure of damages against the unions was the attorneys' fees incurred by Lampkin in pursuing his claim against the company. *Ames v. Westinghouse Electric Corp.*, 864 F.2d 289, 293 (3d Cir. 1988).

The unions contend that only those attorneys' fees incurred in prosecuting the claim against the employer could be included in the damages award. This is in line with *Ames* and the prevailing case law and is conceded by Lampkin.[5] The unions' argument, however, is so severely truncated that their precise contention or contentions are difficult to discern. They note that Lampkin paid his attorney a fee of $7,500 pursuant to the contingency fee agreement they had made. (In his brief, Lampkin says that the amount paid was $6,000, but

_____

[5]This is the generally applicable principle. It has been held that in some circumstances the claims against the employer and against the union may be so intertwined that fees for the entire case may properly be used as the measure of damages, *Bennett v. Local Union No. 66*, 958 F.2d 1429, 1439-40 (7th Cir. 1992), but Lampkin has not asserted that this exception to the general rule should have been applied in this case.

for our purposes the precise amount need not be determined now.) The unions then conclude that because fees in a greater amount were ordered, those excess fees must represent recovery for work done on the case against the unions. That conclusion is specious. The district judge limited the fees to those incurred in litigating against the company, at least to the extent that it was possible to do so.

The district court apparently reasoned that, even though the fees in this case represented compensatory damages, the amount of fees should be determined by the same method used in statutory fee-shifting cases. Thus, Lampkin's counsel produced evidence regarding the prevailing hourly rate and the number of hours reasonably spent in developing and proving the claim against the company. The only authority which we have found that expressly addresses the question of whether this approach is proper supports the district judge's decision. *Zuniga v. United Can Co.*, 812 F.2d 443, 453-55 (9th Cir. 1987). Nevertheless, we disagree with this method of determining the proper amount of fees, which were the amount of damages recoverable.

In *Zuniga*, the defendant union argued that the plaintiff's fee agreement with his attorney limited the fee to be charged for taking the case through trial to $1,500. The court, however, held that the contract was ambiguous and that the most reasonable construction of the agreement was that the plaintiff was obligated to pay the attorney at an hourly rate for all work performed in the district court. *Id*. at 453. The court then went on to say that it would reach the same result even if the contract had indeed included an upper limit on the amount

that the client would owe his counsel. In dictum, the court said that "the trial judge in the exercise of his discretion could properly award attorney fees in excess of the amount actually paid." *Id.* As support for this view, the court cited cases which hold that the amount of fees actually paid is but one factor to be considered in the balancing process required in a determination of reasonable attorneys' fees under fee-shifting statutes. That reasoning is unpersuasive to us here.

In a court award of attorneys' fees, as for instance under the Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988, the amount actually paid or owed by the client under a contingency fee agreement would not necessarily limit the court in determining a reasonable fee. *Blanchard v. Bergeron*, 489 U.S. 87 (1989). This is, at least in part, in recognition that one of the aims of Congress in enacting the statute was to encourage lawyers to take meritorious cases, thus promoting the enforcement of the civil rights statutes. *Id.* at 93, 95. Here, in contrast, the rationale for recovery of fees as damages is making the employee whole. This is achieved by compensating the client for the fees actually incurred under the contract with the lawyer. We refer again to the succinct and lucid statements of the *Ames* court: "[T]he employee should recover as damages from the Union only the attorneys' fees incurred in pursuing the section 301 claim against the employer – consequential damages flowing from the Union's breach of its duty of fair representation." 864 F.2d at 293.

Accordingly, we reverse the judgment as to the amount of damages awarded against the unions and remand for the district court to determine the amount of fees actually paid or

incurred and to award damages in that amount. Prejudgment interest should be allowed on the damages. *See* Fed. R. App. P. 37.

## VI

In a final proposition in their brief, the unions argue in the alternative that they should be entitled to a new trial based on what appears to be an argument of cumulative error. Having found no error thus far, other than in the method of determining the amount of damages, we see no basis for a claim of cumulative error and reversal for a new trial. The unions also attempt to raise new issues under this proposition regarding evidentiary rulings made at trial. We see no abuse of discretion in these rulings. Finally, the unions make a passing reference to "the failure to instruct the jury as these Defendants requested at the instruction conference." Because this reference is not explained by reference to any other part of the unions' argument and the unions fail to cite to the record or in any other way explain what specific instruction or instructions are meant by this reference, we will not consider this point.

## CONCLUSION

We reverse and remand for the district court to determine Lampkin's actual liability to his counsel for attorneys' fees and to enter judgment for compensatory damages in that amount, with prejudgment interest from the date that the fees were actually paid by Lampkin.

Lampkin also requests an award of fees for this appeal. As we have explained, this is not a fee-shifting case. Under the rationale of cases like *Ames*, we have held that Lampkin

was entitled to compensatory damages against the unions and that in this case the fees incurred in pursuing the claim against *the employer* were compensable. That rationale does not extend to this appeal. The record shows that McDonnell Douglas has paid the judgment rendered against it under the terms of a settlement agreement.

Lampkin invokes our inherent, discretionary power to award fees, but we have such authority, in the absence of a statutory provision, only in limited circumstances not present here. Lampkin also invokes Fed. R. App. P. 38 and contends that this appeal is frivolous. His contention is based primarily on the dearth of legal authorities and record citations in the unions' brief, along with other deficiencies he asserts. We do not agree that this appeal was frivolous and we reject the claim for appellate attorneys' fees.

**IT IS SO ORDERED.**